UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARK DIETERLE,
    *Plaintiff*,

v.

RITE AID PHARMACY *et al.*,
    *Defendants*.

No. 3:15-cv-0733 (JAM)

**RULING GRANTING SUMMARY JUDGMENT**

This is a workplace discrimination case brought under Connecticut state law. Plaintiff Mark Dieterle is a gay man, and for six years he was a store manager at a Rite Aid Pharmacy in Putnam, Connecticut. In 2008, a co-worker posted an altered, offensive photograph of plaintiff to a store bulletin board. The co-worker who claimed responsibility for the incident was reported, warned, and transferred. Four years later, plaintiff was terminated from his job after an incident in which he hit a co-worker on the arm with a package of candy bars. Plaintiff claims he was terminated as the result of discrimination on the basis of his sexual orientation and in retaliation for complaining about the photograph in 2008. Defendants have moved for summary judgment. I conclude there are no genuine issues of material fact left for trial and will grant defendants' motion for summary judgment.

**BACKGROUND**

The following facts are undisputed or, where disputed, are presented in the light most favorable to plaintiff. Plaintiff Mark Dieterle brings this case against Rite Aid Pharmacy and related defendants. He was hired as a store manager for the Rite Aid store in Putnam, Connecticut in 2006.

1

Plaintiff is a gay man, and his co-workers were widely aware of this fact. He worked directly under district manager James Paquin. Until shortly before his termination, plaintiff received generally positive reviews, and he had no complaints against him. Doc. #40-1 at ¶¶ 11-13; Doc. #29-1 at 184.

In 2008, plaintiff discovered a picture of himself pinned to the bulletin board at the store. It had been altered so that it appeared that plaintiff was wearing a dress, and the picture had a heart drawn around his head with the word "sweetheart." The following day, plaintiff complained to Paquin, stating that he believed the photograph had been intended to harass plaintiff because of his sexual orientation.

An assistant manager took responsibility for posting the photograph. Paquin reported the incident to John Mackintosh, the Manager of Associate Relations. Rite Aid management then warned the assistant manager and transferred him to another store, with no demotion or pay reduction. Defendants claim the assistant manager was issued a written warning, but the document has not been preserved. Plaintiff admits that he "was content with the transfer" of the assistant manager to another store. Doc. #40-1 at ¶¶ 20, 24-25, 38-40, 43.

Following this complaint, plaintiff continued to receive positive performance reviews from Paquin. He admits he had few issues with Paquin until September 2011, when plaintiff's partner died of cancer. After that, he claims that Paquin began treating him differently, being more critical and distant. According to plaintiff, Paquin's "mission every time he came into my store was to get me, to play on my emotions, and get me wound up so I had to take a pill, meaning an anxiety pill." Plaintiff further claims that Paquin "liked to push my buttons, tweak me and play on my emotions." But he "accepted James [Paquin] for what he was. I'm gay . . . People are going to treat me differently." Plaintiff believes Paquin treated him this way because

plaintiff is gay. Following the death of plaintiff's partner, Paquin rated plaintiff's attitude as "needs improvement" on his annual review and told him that he had to "leave his personal life at home." Nonetheless, Paquin "pulled strings" and made sure plaintiff still received a roughly $8,000 bonus. Doc. #29-1 at 182, 185-86; 191; Doc. #40-1 at ¶¶ 51, 52.

In 2012, Crystal Pomroy, a colleague of plaintiff's, filed a complaint against him. The complaint arose from an incident in the store when plaintiff criticized the way that Pomroy was stocking a shelf; plaintiff tapped her on the arm twice with a pack of eight "fun size" candy bars. Following the tap, Pomroy immediately backed away from plaintiff and moved to leave the aisle to get away from him. Plaintiff admitted that Pomroy had a right to be agitated, and that he had overstepped his boundaries.

Pomroy reported this incident to Paquin, and Paquin then notified HR Associate Manager John Mackintosh, and he had a conversation with Pomroy. She told Mackintosh that this was not the first time plaintiff had made inappropriate physical contact with her. Plaintiff avers that Mackintosh took no steps to confirm these statements, and denies there was ever any other inappropriate physical contact. Doc. #40-1 at ¶¶ 53-55, 59, 65.

Mackintosh then asked Mark Ringuette to investigate the matter further. Plaintiff admitted to Ringuette that he tapped Pomroy at least twice with the package of candy bars. Another employee, Connie Lafortune, described two other incidents that could be construed as inappropriate physical contact from plaintiff, but also described that she had a friendly relationship with plaintiff and never felt threatened by him.

Plaintiff was also interviewed. At his deposition, he stated he thought the overall investigation was an appropriate response to the complaint from Pomroy. Doc. # 29-1 at 250.

Following the entire investigation, plaintiff was fired for allegedly violating the workplace violence policy.

Plaintiff brought this lawsuit in state court in 2014, alleging discrimination on the basis of sexual orientation in violation of the Connecticut Fair Employment Practices Act and retaliation against him for making his 2008 complaint. Defendants removed the case to federal court under this Court's diversity jurisdiction. Defendants have now moved for summary judgment on both counts.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan*, 134 S. Ct. at 1866.

### *The CFEPA Discrimination Claim*

Plaintiff first alleges that defendants discriminated against him because of his sexual orientation, in violation of the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. §§ 46a-51 *et seq.* CFEPA prohibits an employer from "discharge[ing] from employment any individual . . . because of the individual's sexual orientation." Conn. Gen. Stat. § 46a-81c. Discrimination claims under CFEPA are subject to the familiar *McDonnell-Douglas* burden-shifting framework. *See Dep't of Transp. v. Comm'n on Human Rights & Opportunities*, 272 Conn. 457, 463 & n.9 (2005) (federal precedent guides interpretation of disparate treatment claims under CFEPA); *see also McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973).

For the first part of the *McDonnell-Douglas* test, a plaintiff states a *prima facie* case for sexual orientation discrimination with respect to the company's decision to fire him if he shows (1) that he was within the protected class; (2) that he was qualified for the job he held; (3) that he suffered an adverse employment action; and (4) that the circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See, e.g., Walsh v. New York City Housing Auth.*, __ F.3d. __, 2016 WL 3632245, at *3 (2d Cir. 2016). A plaintiff's burden to state a *prima facie* case is "not onerous" and has been frequently described as "minimal." *Ibid.*

If a plaintiff makes out a *prima facie* case, then—under the second part of *McDonnell-Douglas* framework—the burden falls on the defendant to articulate a legitimate, nondiscriminatory reason for his firing. *See ibid.* Once a legitimate, nondiscriminatory reason is advanced, any presumption of discrimination from the plaintiff's *prima facie* case drops away, and plaintiff must then carry the burden for the third part of the *McDonnell-Douglas* test to show that the nondiscriminatory reason(s) advanced by the defendant are a pretext or incomplete and that actual discrimination explains the defendant's action. *Ibid.; Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 156-57 (2d Cir. 2010).

As to the first part of the *McDonnell-Douglas* test, I assume for the purposes of my evaluation of defendants' summary judgment motion that plaintiff has satisfied his minimal burden to create at least a genuine fact issue with respect to each of the elements of a *prima facie* case. As to the second part of the *McDonnell-Douglas* test, it is clear that defendants have advanced a legitimate, nondiscriminatory reason for plaintiff's termination—that defendants reasonably believed plaintiff had violated a company workplace policy when he tapped Pomroy with the candy bars.

Accordingly, the only question remaining concerns the third part of the *McDonnell-Douglas* test: whether there is a genuine fact issue that defendants' stated reason was a pretext (*i.e.*, incomplete or untrue) and that plaintiff's sexual orientation was at least a motivating factor that led the defendants to fire him. For the reasons outlined below, I conclude—even viewing the facts in the light most favorable to plaintiff—that he has not established a genuine fact issue of sexual orientation discrimination for trial.

Plaintiff's counsel conceded at oral argument that any discriminatory intent could only be imputed to defendants through Paquin or Mackintosh. But there is no direct evidence that either of them had discriminatory animus—there is, for example, no allegation that they made anti-gay comments or otherwise directly displayed anti-gay prejudice. Plaintiff's case therefore relies entirely on circumstantial evidence.

The primary evidence is that neither Paquin nor Mackintosh took sufficient steps to discipline Walsh back in 2008—some four years prior to plaintiff's discharge. But, in fact, Paquin took prompt action to report plaintiff's complaint, and Walsh was quickly transferred with a warning letter. Plaintiff raised no objection to this outcome at the time. Plaintiff may, in retrospect, be unsatisfied with how defendants handled the situation, but defendants certainly

6

appeared to take his complaint seriously. It may be possible to interpret from Paquin's and Mackintosh's leniency with Walsh *some* inference that they were not sufficiently sensitive to plaintiff's sexual orientation. But this evidence on its own is insufficient to support a jury finding that Paquin and Mackintosh were biased four years later when they played a role in plaintiff's termination.

Further, any inference from these actions grew weaker with each passing year. There is virtually no evidence of any post-2008 conduct by either Paquin or Mackintosh that indicates discriminatory animus. It does not appear that Mackintosh had any dealings whatsoever with plaintiff between 2008 and 2012. And the evidence plaintiff adduces to show Paquin's animus is thin. He allegedly "riled up" plaintiff at times, and wrote two emails, years before plaintiff's termination, using common metaphors to tell plaintiff to calm down.

No reasonable person would understand this conduct to be suggestive of sexual-orientation discrimination. Nor does the fact that plaintiff's partner passed away in 2011 strengthen this inference. Paquin consistently gave plaintiff high performance evaluations between 2008 and 2011—indeed higher than plaintiff suggested for himself. Further, though the 2012 evaluation was more mixed, it did not suggest discriminatory motive, and it is counterbalanced by the large bonus plaintiff received.

Moreover, there can be little dispute that defendants were entitled to discipline plaintiff for his actions. Plaintiff concedes that defendants' investigation of the incident was appropriate. Plaintiff denies that his actions actually violated the workplace policy. But, even in his version of events, it was reasonable for Mackintosh, after having interviewed Pomroy and others, to conclude that, at minimum, plaintiff's actions constituted an "expression of intention to scare . . . another." Doc. #29-1 at 36 (Rite Aid workplace violence policy). Indeed, plaintiff has admitted

7

that he knew it was wrong to do what he did and apologized to Pomroy repeatedly. Defendants have also pointed to other employees who were fired for violating the workplace violence policy. Doc. #27 at 15.

Whether I personally agree that plaintiff's conduct should have led to his firing is irrelevant, because my task here is to consider whether the evidence shows a discriminatory motive, not to sit in judgment of the defendants' business decisions as some kind of super-personnel department. *See, e.g, Delaney v. Bank of America Corp.*, 766 F.3d 163, 169 (2d Cir. 2014). On the undisputed facts, defendants had every right to terminate plaintiff. Plaintiff has not adduced sufficient evidence to create a triable issue that, despite his admitted misconduct, a motivating factor for his termination was his sexual orientation.

### *The Retaliation Claim*

Plaintiff also claims that he was fired in retaliation for his 2008 complaint about the photograph. In order to establish a *prima facie* case for retaliation under the CFEPA, plaintiff must show: (1) that he engaged in a protected activity of which defendants were aware; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *See DeMoss v. Norwalk Bd. of Ed.*, 21 F. Supp. 3d 154, 166 (D. Conn. 2014); *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) ("The analysis of . . . retaliation claims under CFEPA is the same as under Title VII.").

The central question again is whether plaintiff can show a triable issue of a causal connection between his 2008 complaint and his termination. Plaintiff stated at his deposition that he was not alleging that the company retaliated against him in any way regarding his 2008 complaint. Doc. #29-1 at 179. Even leaving aside this apparent concession, plaintiff has

produced no evidence whatsoever to show a connection between his complaint about the photograph and his termination four years later. Nor can he establish such an inference based on the temporal proximity of the complaint and his termination: four years is far too long to satisfy this standard. *See, e.g.*, *Douglas v. City of Waterbury*, 494 F. Supp. 2d 112, 125 (D. Conn. 2007) ("In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish [a] temporal relationship.").

I therefore will dismiss plaintiff's retaliation claim as well.

## CONCLUSION

The motion for summary judgment (Doc. #25) is GRANTED.

The Clerk of Court shall close the case.

It is so ordered.

Dated at New Haven this 12th day of September 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge